98 473
99 510

ROBERT COSGROVE *vs.* KENNEBEC LIGHT AND HEAT COMPANY.

Kennebec.    Opinion March 11, 1904.

*Negligence,* defect in machinery not proven.    *Contributory negligence,* of plaintiff.

1.  Negligence on the part of the plaintiff that is the proximate cause of the injury will preclude an action to recover damages for the injury.

2.  In an action by the plaintiff, a night engineer in the service of the Oakland Mfg. Co., to recover damages against the Kennebec Light & Heat Co. for injuries sustained by him as the result of bringing his right hand in contact with an electric light wire in the fire-room of the Oakland Mfg. Co., it appeared that the dangerous condition of the electric cord was caused by the breaking down of the insulation that separates the primary and secondary wires in the transformer at the defendant's electric station, whereby the entire high voltage of the primary current was transmitted through the secondary wires which supplied the incandescent lights in the fire-room of the Oakland Co., where the plaintiff was employed.   It further appeared, however, that this transformer was purchased from a reputable house, that it was of a standard pattern and approved design, and that it had not previously shown any indications of breaking down.

*Held;* that under these circumstances the mere fact of the burning out of the defendant's transformer was wholly insufficient to establish the charge of negligence, or breach of duty, on the part of the defendant company.

3.  It further appeared that two hours before the injury, Higgins, the day engineer, informed the plaintiff that there was trouble with the wires and that he had received a shock from the button controlling the light, and warned him not *to touch* it; but the plaintiff contended that he was induced by the assurances of the defendant's station agent, Berry, and by the nature of foreman Soule's telephone communication, to believe that the danger existing when Higgins received a shock from the button had been obviated, and that at the time of the accident he was following the instructions of Berry to "draw the light in where it belonged under the apron of the boilers."

*Held;* On a motion to set aside a verdict for the plaintiff, that his testimony in regard to the time and substance of the conversation by telephone with foreman Soule is so strongly discredited by the circumstances and its own inherent improbability, as well as by the great weight of positive evidence against it, that it cannot be deemed sufficient to support a finding that the plaintiff was misled or induced to relax any prudence or vigilance respecting the electric wires in the fire-room by reason of his conversation over the telephone with foreman Soule.

4. It further appeared that if the plaintiff was directed by station agent Berry to "tie the lamp under the apron where he wanted it" he performed the undertaking with due regard to the warnings he had received; he attached a string to the electric cord, drew the lamp into the desired position, tied the other end of the string around the pipe and fully completed the task without accident or injury of any kind. The conclusion was, therefore, deemed irresistible that after the plaintiff had finished his task of tying the lamp under the apron and as he was about to descend from the ladder, he unnecessarily and thoughtlessly grasped the electric cord and thereby received the shock and injury of which he complains. It was accordingly

*Held;* that a want of due care on the part of the plaintiff himself was the proximate cause of his injury, and that the verdict was clearly erroneous.

Motion for new trial by defendant.  Motion sustained.  New trial granted.

This was an action on the case to recover damages for injuries received by the plaintiff on the 18th day of February, 1901, by reason of his right hand being burned on an electric wire in the Oakland Manufacturing Company's shop but supplied with electricity from the defendant company's station, and sustaining a compound fracture of the collar bone as he fell after being burned.  It was claimed that these injuries were caused through the negligence of the defendant company.

The verdict was for the plaintiff in the sum of $1,555.

The case appears in the opinion.

*Geo. W. Heselton,* for plaintiff.

*Orville D. Baker,* for defendant.

SITTING:  WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

WHITEHOUSE, J.   The plaintiff, a night engineer in the service of the Oakland Manufacturing Company of Gardiner, recovered a verdict of $1,555 against the Kennebec Light and Heat Company for injuries sustained by him as the result of bringing his right hand in contact with an electric light wire in the fire-room of the Oakland Company.  The case comes to this court on motion to set aside the verdict as against the evidence.

It is not in controversy that the electric lights for the engine house

of the Oakland Company were furnished by the defendant company, and the wires hung in the pump-room and the fire-room substantially as required by the agents of the Oakland Company. The electric cord or wire in the fire-room, in connection with which the accident occurred, was suspended from the ceiling, and when the cord was plumb the light was about five and a half feet from the steam gauges in front of the boilers, and eight or nine feet from the floor. The apron or smoke flue projected about four feet and a half over the front of the boilers. For the purpose of bringing the light nearer the steam gauges, the electric cord was drawn in from its vertical line and "triced" under this apron by the use of twine; and it had been allowed to remain in that situation until it became detached a short time before the accident. The wires for these lights came in over the boilers from the defendant's electric light station, a few rods distant. The transformer, which reduced the high voltage current and transmitted the low voltage through these secondary lighting wires to the incandescent lamps, was also located in the electric station.

In the afternoon of February 18, 1901, the plaintiff came at the usual hour of five o'clock to commence his work as night engineer, relieving Mr. Higgins, the day engineer, of his duties. He testifies that Higgins then said to him: "'Robert, I wouldn't turn that button there that gives us the light in the boiler-room, for I got a shock off of it there to-day. It went right up my arm and most knocked me down on the floor.' Says he, 'I wouldn't touch that button to turn the light on or off.'" He further states that Higgins told him to inform Berry, the defendant's agent in charge of the electric station, that his transformer was burning out; and that thereupon he and Higgins went over to the station and he saw the transformer smoking. A few minutes later, about quarter past five, the plaintiff says he telephoned Mr. Soule, the defendant's foreman in Gardiner, that Higgins asked him to tell Soule that his transformer was burning out, and that Soule replied, "All right." About 5.30 or 5.40 P. M. he says he went over to the electric station again and told Berry that his transformer was burning out, that it was smoking on the wall then, and that the lights were "acting bad;" that Berry replied that he would come in and see to them after he got his

machines going; that about an hour later Berry came into the boiler-room with rubber gloves on his hands and rubber shoes on, and went up on top of the boilers, examined the wires, cut off a wire used by the brick-layers but not then in use, and said to him: "Your lights will go all right now. . . . I will go out and turn the current on, the lights on, and you draw that light in there where it belongs," and the plaintiff said all right, he would. The plaintiff then explains the accident as follows: "I immediately got the ladder, put it up to the boiler front. While I was in the act of going up the ladder, the lights came on. The boy was at the foot of the ladder with the lantern. I was in the act of tying the string around the wire of the lamp, when my right hand came in contact with the wire and I got a shock. It made me jump and this hand came against the boiler front which formed a complete circuit through my body." The hand was so burned that it was necessary to amputate one of the fingers, and by falling from the ladder the plaintiff sustained a fracture of the collar bone.

Mr. Higgins, called as a witness for the plaintiff, states that when he told the plaintiff that he received a shock from the button that afternoon, he added, "if you don't believe it, you try it;" and the language of the plaintiff's reply was: "To hell with it! I won't touch it; I don't like the stuff." In answer to the special inquiry, "What did you say to him in the way of advice as to handling or not handling the wires, Higgins testifies: "I told him I wouldn't touch it if I was him; gave him advice, that's all."

The plaintiff's son, Ralph C. Cosgrove, sixteen years of age, who stood at the foot of the ladder at the time of the accident, gives a version of it materially different from that of the plaintiff himself. He states that his father waited on the ladder until the electric light was turned on by Mr. Berry; that he tied one end of the string around the electric cord, drew the light in under the apron and tied the other end of the string around a pipe in front of the boiler to hold the light where he wanted it; that in doing this he did not take hold of the electric cord with his hands at all; that the next thing he saw, his father was hung on the wire with one hand against the face of the boiler and the other on the wire about a foot above the lamp.

The reasonable inference from this testimony that the plaintiff thoughtlessly and carelessly took hold of the electric cord with his hand after he had completed the act of tying it under the apron, appears to be confirmed to some extent by the testimony of Dr. Giddings, also a witness for the plaintiff, who states that the tissues were burned and scarred on the inside of the thumb and across the palm of the hand.

It satisfactorily appears from all the evidence, including the subsequent investigations, that the dangerous condition of the electric cord in the fire-room was caused by the breaking down of the insulation that separates the primary and secondary wires in the transformer at the defendant's electric station, whereby the entire voltage of the primary current was enabled to pass into the secondary wire which supplied the lights in the fire-room. It is not in controversy, however, that this transformer was purchased from a reputable concern, that it was of a standard pattern and approved design, and that it had not previously shown any indications of breaking down. It is not seriously contended, therefore, on the part of the plaintiff that any negligence or breach of duty on the part of the defendant company is established by the mere fact of the burning out of this transformer. But the plaintiff insists that notwithstanding the warning and advice given him by Higgins at five o'clock that afternoon, he was induced by the assurance of Berry after the investigation made with the rubber gloves and by the nature of Soule's telephone message, to believe that the danger existing at the time Higgins received a shock from the button, had been obviated; that at the time of the accident he was following the instructions of Berry to "draw the light in where it belonged," under the apron of the boilers, and that he was in the exercise of reasonable care in so doing when the accident happened.

But without deciding whether the testimony introduced by the plaintiff himself, in connection with the testimony of his son, Ralph C. Cosgrove, authorized the jury to find that the injury was sustained by the plaintiff while following the alleged instructions of Berry to "tie the cord under where it belonged," it is proper to consider whether upon all the evidence in the case the jury were

warranted in finding that the plaintiff's account of his injury was a credible and reliable one, for the defendant earnestly contends that the plaintiff's version is distorted and erroneous in regard to the most material facts and circumstances connected with the accident.

With regard to the telephone message sent by the plaintiff to Mr. Soule, the defendant's foreman, it is conceded that the plaintiff telephoned to him but once that evening, and Soule testifies that he distinctly remembers that it was not at quarter past five o'clock as claimed by the plaintiff, but after supper between seven and seventen P. M. In this he is corroborated by Mrs. Morrison, his wife's mother, who was visiting at his house at the time. She states that supper was finished before the telephone call came. Soule states that the plaintiff telephoned him that there was "some trouble with the wires in the fire-room;" he didn't know the nature of it, but he was "getting a shock off of the button." Soule says he replied, "be careful, Robert, and I will come right down." Mrs. Morrison says she "heard them talking about there being trouble and heard Mr. Soule say at the close, 'be careful, Bob.'" She distinctly recalled that part of the conversation because she learned from Mr. Soule the same evening that Mr. Cosgrove had been hurt. Thereupon Mr. Soule says he put on his coat and started for the station, going by the way of the post-office, but before arriving at the station he learned of the plaintiff's injury.

The plaintiff's story in its most essential particulars is also emphatically contradicted by Mr. Berry, the defendant's station agent. His testimony corroborates Mr. Soule and Mrs. Morrison as to the time when the plaintiff telephoned to Soule, and shows that he and not Higgins directed the message to be sent. He states that he didn't see any smoke issuing from the transformer, and was unable to discover by his examination in the fire-room that the wire was grounded at any point; that after turning on the current again the light seemed to be shining fairly well, but not quite as brightly as usual; that he went up on the ladder himself and tied the string around the electric cord, and that the plaintiff only took hold of the string and drew the cord under the apron, tying that end of the string around the pipe; that when the plaintiff drew the wire against

the apron a spark was emitted, and he told the plaintiff not to touch it, to keep away from it and telephone Mr. Soule, and that when he came back again the plaintiff told him Soule was coming down; that the plaintiff in the mean time had tied the lamp over nearer the gauge and was then holding the lamp with one hand and wiping it with the other, and that he then told the plaintiff a second time not to touch the wire, and that "if he took hold of it he would never let go." A few minutes later he learned from Ralph that the plaintiff had received 'an awful shock," and then reminded the boy that he heard him warn his father to let the wire alone.

With reference to the testimony of Berry, Higgins makes the important statement that seven or eight months before this suit was brought, and before there was any claim for damages on the part of the plaintiff, or any discussion in regard to the question of liability, Berry stated to him all the facts and circumstances connected with the accident in precise accordance with the version given by him in his testimony before the court. Higgins makes the further significant statement that when the plaintiff gave him an account of the accident soon after it occurred, he did not then claim that he received the injury in consequence of following Berry's directions to tie the lamp in under the apron, or that Berry was in any other way responsible for the accident.

The plaintiff admits that Higgins told him to give notice to Berry and not Soule, of the trouble with the electric lights. Berry made an effort to discover and remedy the difficulty, but when he saw the electric spark flash from the contact of the wire with the apron of the boiler, he evidently did not consider the result of his effort entirely satisfactory. He accordingly decided to have notice sent to the foreman, Mr. Soule, and requested the plaintiff to give the notice by telephone. This seems reasonable and probable, and is in entire harmony with the order of events stated by Berry and Soule.

Again, when Soule was informed by the plaintiff through the telephone that his "transformer was burning out," it does not seem reasonable or credible that Soule's only reply was "All right." He knew what the burning out of a transformer indicated, and it is highly reasonable and probable that he would give some direction or

some assurance of his personal attention to the matter.    He says he did, and it is not disputed that he did in fact immediately start for the station.    But assuming that the reply was "All right" and nothing more, it is still inconceivable that the plaintiff, with the general knowledge which he undoubtedly had, that the "burning out" of a transformer, with a shock from an electric button, must indicate a dangerous condition of the wires, could possibly have understood the words "All right" to signify anything more than that the message was understood and the matter would receive attention.

The testimony of the plaintiff in regard to the time and substance of the conversation by telephone with Mr. Soule is thus so strongly discredited by the circumstances and its own inherent improbability, as well as by the great weight of positive evidence against it, that it cannot be deemed sufficient to support a finding that the plaintiff was misled or induced to relax any prudence or vigilance respecting the electric wires in the fire-room by reason of his conversation with Mr. Soule.    Even if he did not understand that he was expressly cautioned by Soule to be "careful," the plaintiff had already been sufficiently admonished by Higgins and by his own observation of the transformer, to impress upon him the necessity of exercising care and caution in handling the lamp and the electric cord.    He admits that he was promptly informed when he came on duty that afternoon that there was trouble with the wires and that Higgins had received a shock from the button controlling the light so severe that it "nearly knocked him down;" and his profanely emphatic reply to the effect that he didn't like the stuff and wouldn't touch it, shows that he appreciated the warning and realized the danger.    He was a competent engineer of good general intelligence and had had several years of practical observation and experience in the use of electricity in that room. . He must have understood that the warning of Higgins was intended to include the wire as well as the button, for if the button was dangerous the wire was obviously more so.    He saw that Berry wore rubber gloves when he made his examination of the wires, and according to the testimony of Berry was repeatedly and impressively warned by him not to take hold of the wires.

Assuming then that the plaintiff, as he claims, was told by Berry

to tie the lamp under the apron where he wanted it, it would seem that he performed the undertaking with due regard to the warnings he had received, for it clearly and distinctly appears from the testimony of the son that the plaintiff tied the string around the electric cord, drew it into the desired position, tied the other end of the string around the pipe, and fully completed the task without injury or accident of any kind. It was not until all this had been done that he looked up and saw that his father had hold of the wire with one hand and the other hand against the boiler. The conclusion is therefore irresistible that for some unexplained reason, after the plaintiff had finished his task, and as he was about to descend from the ladder, he unnecessarily and thoughtlessly or recklessly grasped the electric cord and thereby received the shock and the injury of which he complains.

It is accordingly the opinion of the court that a want of due care on the part of the plaintiff himself was the proximate cause of the accident and that the verdict is clearly erroneous.

*Motion sustained.    Verdict set aside.    New trial granted.*